

**SIGNED this 4th day of May, 2022**

Shelley D. Rucker

Shelley D. Rucker
CHIEF UNITED STATES BANKRUPTCY JUDGE

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

In re:

**Jeffrey Mitchell Curtis and
Heather Ceceilia Curtis,**
     **Debtors.**

**No. 1:18-bk-13327-SDR**

**Chapter 7**

**Thomas E. Hurst and
Nancy D. Hurst,**
     **Plaintiffs,**

**v.**

**Adv. No. 1:20-ap-01046-SDR**

**Jeffrey Mitchell Curtis and
Heather Ceceilia Curtis,**
     **Defendants.**

## <u>MEMORANDUM OPINION</u>

### I.    INTRODUCTION

This adversary proceeding highlights the importance of specificity when negotiating

agreed orders.  Between 2012 and 2014, plaintiffs Thomas and Nancy Hurst rented a house to

defendants Jeffrey and Heather Curtis, currently Chapter 7 debtors in Case No. 1:18-bk-13327-

SDR (the "Main Case").  Defendants incurred the obligations under their lease after they filed a prior Chapter 13 bankruptcy case, Case No. 1:11-bk-16725-SDR (the "First Case").  Plaintiffs allege that defendants significantly damaged the rental house while living there, prompting plaintiffs to file a proof of claim for $6,590.70 in the First Case.  Due to the timing of the execution of the lease, however, plaintiffs' claim arose post-petition.  The parties eventually reached an agreement, memorialized by an agreed order (the "Agreed Order"), that the claim would be allowed under 11 U.S.C. § 1305(b) and paid pro rata like a general unsecured claim for the life of defendants' Chapter 13 plan in the First Case.  At the conclusion of the plan, any remaining balance would be "deemed non-dischargeable," but no other language in the agreed order explained what that phrase meant.  (First Case, Doc. No. 107 at 1.)

Defendants subsequently filed the Main Case, and plaintiffs' claim potentially is subject to discharge in the Main Case as a pre-petition claim.  Faced with that possible outcome, the parties disagree over whether the Agreed Order classified plaintiffs' claim in the First Case as nondischargeable for all time or only for that case.  Plaintiffs commenced this adversary proceeding to resolve the issue of their claim's dischargeability, and currently pending before the Court are the parties' cross-motions for summary judgment under Federal Civil Rule 56, made applicable by Federal Bankruptcy Rule 7056.  (Doc. Nos. 19, 23.)

This adversary proceeding is a core proceeding under 28 U.S.C.§§ 1334(a) and 157(b)(2)(I) and (J), and the Court confirmed previously that the parties do not dispute jurisdiction.  (*See* Doc. No. 10.)  The Court held oral argument on March 10, 2022, and received supplemental filings from the parties on March 11, March 24, and April 7, 2022.  (Doc. Nos. 34, 42, 43, 44.)  For the reasons below, the Court will deny plaintiffs' motion and will grant defendants' motion in part.

## II.    BACKGROUND

### A. *Defendants rent plaintiffs' house after they file the First Case.*

This adversary proceeding traces its origins to the renting of a house nearly 10 years ago.

On August 7, 2012, defendants signed a residential lease agreement (the "Lease") for the use of a

house located at 69 Smoketree Circle in Ringgold, Georgia. (Doc. No. 34-1.)[1] The Lease contains

several provisions that are relevant to the pending motions. The Lease took effect on August 17,

2012 and would renew automatically every year unless terminated in writing. (*Id.* at 1 ¶ 1.) The

record contains no details about what the condition of the house was when the Lease took effect;

but under the Lease, defendants agreed "to accept the property in its current condition and to return

it in 'moving-in clean' condition." (*Id.* ¶ 5.) Defendants agreed further "to accept said dwelling

and all appliances therein as being in good and satisfactory condition unless a written statement of

any objections is delivered to Landlord within three (3) days after resident takes possession." (*Id.*

¶ 22.) With respect to restrictions on activities inside the house, the Lease included the following

restriction: "Fireplace will **NOT** be used at any time except for emergency heat, i.e. when electric

service has been off for an extended period of time. **Call property manager FIRST.**" (*Id.* ¶ 35

(emphasis in original).) Plaintiffs imply but have not stated explicitly that no disruptions to

electrical service occurred at the house while defendants lived there. Plaintiffs imply further that

defendants never called the property manager—presumably Mr. Long—regarding the fireplace.

The record in this adversary proceeding contains few facts about how the parties' rental

relationship proceeded or ended. Information available from the First Case indicates that

---

[1] The Court notes, for the sake of the record, that only Heather Curtis signed the Lease. Also, the Lease identifies plaintiffs as the landlords of the house, but neither plaintiff signed the Lease. Instead, someone named Sam Long signed the Lease using the title of Property Manager. The Court does not know who Sam Long is, but the parties have not contested that he had authority to sign the Lease as an agent for plaintiffs.

defendants moved out of plaintiffs' house around the end of November 2014. Without making any findings, the Court notes that the house appears to have been in a significant state of disrepair when defendants left. The Court will address additional details below, as needed.

### B. *Plaintiffs file a proof of claim in the First Case, and the parties resolve it with the Agreed Order.*

A major issue in this adversary proceeding is how the timing of the Lease intersected with the timing of defendants' bankruptcy history. On December 5, 2011, defendants filed a voluntary Chapter 13 petition in the First Case. The original schedules filed with the petition could not have included the Lease or any potential liability stemming from it because defendants did not sign it until about eight months later. The Lease, as a post-petition contract, came to the Court's attention when plaintiffs filed the original version of Claim 19 on December 29, 2014. In their original proof of claim, plaintiffs asserted $6,590.70 for unpaid rent, late charges, and damages to their house. The alleged damages included holes in the walls; broken doors; a broken mesh screen and grate on the fireplace; water leaks; and large amounts of garbage coupled with unsanitary conditions. The original proof of claim included attachments consisting of a spreadsheet that plaintiffs used to track what defendants allegedly owed them; photographs depicting the condition of the house; a police report generated to document the condition of the house; and copies of purported email communications between the parties between 2012 and 2014.

Defendants filed an objection to Claim 19 on January 19, 2015, asking to have the claim disallowed in its entirety. (First Case, Doc. No. 66.) Defendants objected that the Lease "was entered into 246 days after the filing of this case and is not for property or services necessary for the Debtors' performance under the plan." (*Id.* at 2.) Defendants objected further that Claim 19 was "for a lease deficiency that resulted after debtors vacated the premises and is not a priority

4

debt as defined by 11 U.S.C. § 507." (*Id.*)  Plaintiffs responded that Claim 19 should have been paid as an administrative expense under 11 U.S.C. § 503 because the rental of plaintiffs' house "was an actual, necessary cost and expense to preserve the debtor's estate as it provided a home and the attendant necessities such as running water, heat/air, etc, to allow them to be able to maintain employment during the course of the Chapter 13." (First Case, Doc. No. 68 at 1.)

On June 22, 2015, the parties resolved their differences over Claim 19 through the Agreed Order, which is central to the pending motions in this adversary proceeding.  The Agreed Order contained three decretal paragraphs.  In the first decretal paragraph, the Court ordered "that the claim filed in the matter by Hurst shall be allowed as a section 1305 claim and be paid pro rata in accordance with the Confirmed Plan, the entire claim amount being treated as a general unsecured claim, with any remaining balance of the bankruptcy claim deemed non-dischargeable without the need for further Orders of the Court." (First Case, Doc. No. 107 at 1.)  In the second decretal paragraph, the Court memorialized defendants' consent to allow plaintiffs to pursue litigation in state court to recover any amount that defendants still owed them after the First Case ended.  (*Id.*)  In the third decretal paragraph, the Court increased defendants' plan payments to reflect the inclusion of Claim 19.

Plaintiffs filed an amended version of Claim 19 on December 8, 2016, asserting a new balance of $15,404.69.  The Trustee certified completion of plan payments on May 16, 2017.  (First Case, Doc. No. 122.)  Defendants received their discharge on May 23, 2017 (First Case, Doc. No. 130), and the First Case closed with a final decree on August 21, 2017.  The First Case concluded without any further litigation between the parties.

### C. *The parties disagree over the Agreed Order when defendants file the Main Case.*

On July 27, 2018, approximately 11 months after the First Case ended, defendants filed a new Chapter 13 voluntary petition—the Main Case.  Defendants did not list plaintiffs' names or address anywhere in the petition, the schedules, or the confirmed plan.  (Main Case, Doc. Nos. 1, 2, 37.)  At most, the plan addressed plaintiffs' claim indirectly by setting forth in Part 5.1 that unsecured claims would be paid in full.  (Main Case, Doc. No. 37 at 7.)  Despite the lack of notice from defendants, plaintiffs filed Claim 14 on October 2, 2018, before the Mian Case's deadline to file claims.  Plaintiffs asserted an unsecured balance of $10,218.55 based on "breach of contract and damages to property."  (Main Case, Claim 14-1 at 2.)

If defendants had stayed in a Chapter 13 plan that paid all unsecured claims in full then the Court probably would not be writing today, but two events occurred that led to this adversary proceeding.  First, and over plaintiffs' objection, defendants modified their plan on May 30, 2019 to reduce unsecured claims to payment on a pro rata basis.  (Main Case, Doc. No. 63 at 7.)  Second, defendants converted their case to Chapter 7 on September 1, 2020 and filed an amended Schedule E/F on September 23, 2020 that listed the value of plaintiffs' claim at zero.  (Main Case, Doc. Nos. 79, 100.)  Defendants' reduction of plaintiffs' claim, first to pro rata and then to zero, created what plaintiffs considered to be a direct conflict with the Agreed Order and the language in it that classified their claim as nondischargeable.   To resolve that conflict, plaintiffs commenced this adversary proceeding by filing their complaint on September 29, 2020, just six days after defendants filed the amended Schedule E/F.  (Doc. No. 1.)  The complaint contained a single count for nondischargeability under 11 U.S.C. § 523(a)(6).  Plaintiffs asserted that defendants' debt "is the result of a breach of contract and damages."  (*Id.* at 2.)  Plaintiffs asserted further that the debt

"was deemed non-dischargeable in [the First Case] since it was a post-petition debt and no court permission was obtained." (*Id.*) Finally, plaintiffs justified their use of Section 523(a)(6) by alleging that the damage that defendants caused at their house was "willful and intentional in that the Defendants agreed at the time they leased the premises from the Plaintiffs that they would not use the fireplace located in the home, but in spite of their agreement, the Defendants willfully and intentionally used the fireplace causing extensive damage to the property belonging to the Plaintiffs." (*Id.*) Compared to the types of damage alleged in the original proof of claim in the First Case, the adversary complaint did not explicitly link any damages at plaintiffs' house to any cause other than the alleged unauthorized use of the fireplace. In their answer, defendants denied any willful or malicious conduct and denied that the Agreed Order included any adjudication of willful or malicious conduct. (Doc. No. 5.)

The parties' cross-motions for summary judgment have sharpened the contrast between their interpretations of the Agreed Order. Plaintiffs' view is simple: The parties reached an agreement "to declare any remaining balance owed by the Defendants non-dischargeable" (Doc. No. 23-1 at 2); and now "[t]he entry of the prior Agreed Order precludes the Defendant from now discharging the obligation to the Plaintiffs." (*Id.*; *see also* Doc. No. 26 at 2 ("In this matter, drawing all inferences in favor of the Plaintiffs it is clear that in a previous case there was [an order] declaring the debt as non-dischargeable.").) Plaintiffs also draw support for their position from the details about damages that they placed in Claim 19 in the First Case. According to plaintiffs, the parties were addressing more than a procedural point when they negotiated the Agreed Order; they were creating a permanent remedy that plaintiffs could pursue in state court long after the First Case ended. (*See* Doc. No. 44 at 3 ("The Proof of Claim in the prior Chapter

7

13 also set forth on the claim damage caused to the rental property by the Defendant. It was therefore an issue at all times during any negotiations leading to the entry of the Agreed Order in Case # 11-16725.").)

Defendants view plaintiffs' position as tantamount to an invocation of collateral estoppel and argue why collateral estoppel should not apply to the Agreed Order. "Because the debt was incurred after the filing of the prior case, the parties entered into an agreed order essentially stipulating that the debt was non-dischargeable in that case. That the damage to the property was a willful or malicious injury was never raised by the Plaintiffs or refuted by the Defendants or judicially determined by the court." (Doc. No. 19-2 at 4.) In support of their position, defendants have submitted an affidavit from their attorney in the First Case, Amanda Stofan (Doc. No. 43), and have asked the Court to consider it as context that resolves ambiguities in the Agreed Order. (Doc. No. 42.) In her affidavit, Ms. Stofan agrees with defendants that willfulness and malice were not addressed in the First Case and that "the purpose of the Agreed Order allowing the claim of Thomas and Nancy Hurst was to resolve an objection to the late filed claim and motion to allow the same filed by the parties. The issue in both the objection and the motion to allow was that the claim was for post-petition rents due under a post-petition contract." (*Id.* at 1.) Apart from what the parties did or did not address in the First Case, defendants make the additional argument that Section 523(a)(6) cannot apply to the record here because "[n]othing in the Plaintiffs' Complaint alleges an intentional tort on the part of the Defendants whereby they intended the consequences of their actions to happen." (Doc. No. 19-2 at 6.)

In contrast to their interpretations of the Agreed Order, the parties appear to agree procedurally on the issues of damages and causation. As noted above, the adversary complaint on

its face focuses entirely on the allegation that defendants used the fireplace in the house without permission. Addressing that focus, plaintiffs have conceded that "[a]lthough the defendants deny having used the fireplace, it should be inferred by the Court they did which in this matter creates a material issue of fact to be determined by the trier of fact." (Doc. No. 26 at 2.)

## III.    DISCUSSION

### A.    *Summary Judgment Generally*

The standard for summary judgment under Civil Rule 56 is well known. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "Here, the parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party or parties has satisfied the burden and should be granted summary judgment on the other motion." *NetJets Large Aircraft, Inc. v. United States*, 80 F. Supp. 3d 743, 747 (S.D. Ohio 2015). "When reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citation omitted).

9

### B.  Does collateral estoppel apply to the Agreed Order?

Although plaintiffs never use the phrase "collateral estoppel" in their motion papers, their interpretation of the Agreed Order effectively is an invocation of that doctrine, and collateral estoppel is the sole basis for their motion.  (*See* Doc. No. 23-1 at 2 ("The entry of the prior Agreed Order precludes the Defendant from now discharging the obligation to the Plaintiffs.").) Accordingly, the Court will begin by reviewing whether collateral estoppel precludes defendants from litigating the scope and effect of the Agreed Order.  "[T]he doctrine of collateral estoppel applies when: (1) the issue in the subsequent litigation is identical to that resolved in the earlier litigation, (2) the issue was actually litigated and decided in the prior action, (3) the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation, (4) the party to be estopped was a party to the prior litigation (or in privity with such a party), and (5) the party to be estopped had a full and fair opportunity to litigate the issue."  *Santana-Albarran v. Ashcroft*, 393 F.3d 699, 704 (6th Cir. 2005) (citations omitted).

The record of the First Case shows that plaintiffs cannot meet the first three requirements for collateral estoppel.  Nondischargeability under Section 523(a)(6) for willful and malicious injury requires proving both willfulness and malice.  *See MarketGraphics Research Group, Inc. v. Berge (In re Berge)*, 953 F.3d 907, 916 (6th Cir. 2020) ("A creditor must prove both elements before the debt may be exempted from discharge."), *reh'g denied* (May 6, 2020), *cert. denied sub nom. MarketGraphics Rsch. Grp., Inc. v. Berge*, 141 S. Ct. 1057, 208 L. Ed. 2d 524 (2021).  A creditor must establish both elements by a preponderance of the evidence.  *See Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999) (citations omitted); *Rice v. Morse (In re Morse)*, 524 B.R. 774, 794 (Bankr. E.D. Tenn. 2015) (citations omitted).  In the First Case, defendants' only objection to Claim 19 was that the Lease "was entered into 246 days after the

10

filing of this case and is not for property or services necessary for the Debtors' performance under the plan." (First Case, Doc. No. 66 at 2.) No litigation about willful and malicious conduct occurred, and a determination of willful and malicious conduct was not necessary to resolve the objection about a post-petition claim. Consequently, the issue of nondischargeability under Section 523(a)(6) is not identical across the First Case and the Main Case; was not actually litigated; and was not necessary to resolve whether to allow a post-petition claim under Section 1305. *Compare, e.g., Smith v. Cornelius (In re Cornelius)*, 405 B.R. 597, 603 (Bankr. N.D. Ohio 2009) (collateral estoppel barred litigation under Section 523(a)(6), where the elements needed under that section "correlate to the findings and conclusions made by the state court [with respect to] the heightened level of culpability under which the Defendant was found to have acted when causing injury to the Plaintiffs") *with In re Crownover*, 417 B.R. 45, 55 (Bankr. E.D. Tenn. 2009) (Stinnett, *J.*) (state-court finding of intentional breach of contract was too vague to support collateral estoppel for nondischargeability under Section 523(a)(6)). The Court's conclusion is consistent with plaintiffs' concession that a question of fact surrounds the only conduct that they have alleged as the basis for nondischargeability—the use of the fireplace without permission. (*See* Doc. No. 44 at 3 ("Although the defendants deny having used the fireplace, it should be inferred by the Court they did which in this matter creates a material issue of fact to be determined by the trier of fact.").)

Without an identity of issues or any determination of defendants' conduct from the First Case, plaintiffs' motion fails without the need to assess the last two elements necessary for collateral estoppel. Under these circumstances, the Court will deny plaintiffs' motion.

### C.  How does the Agreed Order treat plaintiffs' claim?

In rejecting any application of collateral estoppel here, the Court has clarified what the

Agreed Order does *not* say.  The Court turns next to the language of the Agreed Order and what it

*does* say.  "An agreed order, like a consent decree, is in the nature of a contract, and the

interpretation of its terms presents a question of contract interpretation."  *City of Covington v.*

*Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1227 (6th Cir. 1995).  The basic principles of

contract interpretation under Tennessee law[2] are straightforward:

> The cardinal rule for interpretation of contracts is to ascertain the intention
> of the parties and to give effect to that intention, consistent with legal principles.  If
> the language of the contract is clear and unambiguous, the literal meaning controls
> the outcome of the dispute.  In such a case, the contract is interpreted according to
> its plain terms as written, and the language used is taken in its plain, ordinary, and
> popular sense.  The interpretation should be one that gives reasonable meaning to
> all of the provisions of the agreement, without rendering portions of it neutralized
> or without effect.  The entire written agreement must be considered.  In construing
> a contract, the entire contract should be considered in determining the meaning of
> any or all of its parts.  It is the universal rule that a contract must be viewed from
> beginning to end and all its terms must pass in review, for one clause may modify,
> limit or illuminate another.
>
> However, on occasion, a contractual provision may be susceptible to more
> than one reasonable interpretation, rendering the terms of the contract ambiguous.
> Ambiguity, however, does not arise in a contract merely because the parties may
> differ as to interpretations of certain of its provisions.  A contract is ambiguous only
> when it is of uncertain meaning and may fairly be understood in more ways than
> one.  The court will not use a strained construction of the language to find an
> ambiguity where none exists.

*Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 703–04 (Tenn. 2008) (internal quotation marks

and citations omitted).

---

[2] Although the Agreed Order is an order from a federal Bankruptcy Court, contractual principles from state
law will apply.  *See Harper v. Oversight Comm. (In re Conco, Inc.)*, 855 F.3d 703, 711 (6th Cir. 2017)
(terms of a Chapter 11 plan interpreted under state law) (citing *Official Comm. of Unsecured Creditors v.
Dow Chem. Corp. (In re Dow Corning Corp.)*, 456 F.3d 668, 676 (6th Cir. 2006)); *but see Evoqua Water
Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 236 (6th Cir. 2019) (Bush, *J.*, concurring) (questioning
whether state law should apply to the interpretation of federal consent decrees).

With the above principles in mind, the single most important factor in the Court's review is the reference in the Agreed Order to 11 U.S.C. § 1305, presumed to mean Section 1305(b) specifically. "Section 1305 of the Bankruptcy Code provides that certain postpetition claims may be filed and allowed in a chapter 13 case. It creates an exception to the basic scheme of the Bankruptcy Code, which is to affect claims arising before the filing of the bankruptcy petition. While there are other exceptions to the requirement that an allowable claim arise before the petition, postpetition claims are generally disallowed in bankruptcy cases, including chapter 13 cases." 8 Collier on Bankruptcy § 1305.01 (16th ed. and 2022 Supp.). Section 1305 is permissive. Creditors holding post-petition claims may file a proof of claim under Section 1305(a) and may seek to have it allowed under Section 1305(b), but they are not required to do so. *See Mich. Dep't of Treasury v. Hight (In re Hight)*, 670 F.3d 699, 702 (6th Cir. 2012) (citations omitted). "The holder of the postpetition claim may refrain from filing proof of the postpetition claim, thereby waiving the possibility of a distribution under the chapter 13 plan, in hopes of recovering against the debtor after the closing of the case. A discharge granted in a chapter 13 case would not relieve the debtor of liability on a postpetition claim, unless the holder of the claim has filed a postpetition claim and the debt has been provided for by the plan." 8 Collier on Bankruptcy § 1305.02 (16th ed. and 2022 Supp.). Section 1305(b) claims that are not paid through the plan will not be discharged. *See, e.g., In re Sims*, 288 B.R. 264, 267 (Bankr. M.D. Ala. 2003) ("[A]llowed claims [under Section 1305] may be provided for and therefore ultimately discharged on the completion of the plan. Conversely, claims which are not allowed are not provided for by the plan and will not be discharged at completion."). Section 1305(b) claims that are paid through the plan will be discharged "unless the court approves a written waiver of discharge executed by the debtor after

13

the order for relief under this chapter." 11 U.S.C. § 1328(a). *See Matter of Girardeau*, No. 14-41387-EJC, 2015 WL 7625524, at *4 (Bankr. S.D. Ga. Nov. 16, 2015) (medical debts could not be discharged under Section 1328(a), where the creditors never sought allowance under Section 1305 and where the debtor attempted to file proofs of claim for them); *In re Ruiz*, No. BR 12-63323-TMR13, 2014 WL 1576825, at *3 (Bankr. D. Or. Apr. 17, 2014) (noting in dicta that a Section 1305 claim "could well be subject to § 1328(a)'s general discharge provision"); *see also* Hon. W. Homer Drake, Jr. *et al.*, Chapter 13 Practice & Procedure § 19:4 (Westlaw 2022) ("Because of the possibility that filing a § 1305(a)(2) claim may result in payment of less than the full amount of the claim and discharge of the unpaid amount, a postpetition claimant may wish to consider whether its claim qualifies as an administrative expense claim under Code § 503, which is entitled to priority under Code § 507(a)(2).") (citing *Ruiz*).

The way in which Section 1305(b) operates makes the plain language of the Agreed Order unambiguous without the need to consider parole or other extrinsic evidence. The parties do not contest that defendants entered the Lease after they filed the petition in the First Case, meaning that Claim 19 in the First Case was a post-petition claim. Claim 19 thus would not have been permitted in the First Case except through Section 1305(b). By filing an objection to Claim 19, defendants at first decided to try to keep the claim out of the First Case, taking the risk that they would have to pay the claim outside of a confirmed plan if plaintiffs litigated it after the First Case closed. In that sense, defendants' objection to Claim 19 was consistent with how the Bankruptcy Code would have treated the claim if defendants had done nothing at all: post-petition claim; no treatment in the plan; no payments through the plan, but also no discharge. Defendants later changed their strategy and negotiated the Agreed Order. By negotiating the allowance of Claim

14

19 under Section 1305(b), defendants could pay the claim at least in part through the plan.  In

exchange, though, the parties faced an uncertain outcome not fully addressed by the Bankruptcy

Code:

> The treatment of allowed postpetition claims by Chapter 13 plans is not well-developed by the Code.  Section 1305 seems to contemplate that allowed postpetition claims simply will be dealt with by the plan as if the claims predate the filing.  However, what becomes of an allowed postpetition claim in a Chapter 13 plan that proposes to pay less than 100% of allowed claims?  We know that the Chapter 13 debtor must propose to pay most tax claims in full pursuant to § 1322(a)(2).  However, an allowed postpetition claim for a consumer debt of the kind described in § 1305(a)(2) usually would not be paid in full under a composition plan if it were a claim arising prepetition.  A composition Chapter 13 plan would normally call for the partial payment of such claims to the extent they are unsecured.  The potential postpetition creditor who knows of the Chapter 13 case will be reluctant to permit the incurring of postpetition debt unless the plan provides for full payment of the postpetition claim.

*Allowance* (Code § 1305(b)), 7 Norton Bankr. L. & Prac. 3d ed. § 146:20.  The Court infers that

the parties wanted certainty in any arrangement that they negotiated, which is why they prepared

the second half of the first decretal paragraph of the Agreed Order.  Under the second half, any

balance remaining in Claim 19 after conclusion of the plan would be restored to the status that it

would have had—non-dischargeable status—if Section 1305 had not applied at all.  From this

perspective, the parties' intent in negotiating the Agreed Order becomes clear: They wanted to

allow partial payment through the plan but without discharging the balance as Section 1305 would

suggest.  The Court thus concludes that the Agreed Order was designed to last only for the duration

of the First Case and ran its course once the First Case ended.  The Court's conclusion is consistent

with the absence of any language in the Agreed Order that invokes any statutory provision that

would have excepted plaintiffs' claim from discharge permanently.  *Cf. In re Pacher*, 553 B.R.

294, 295 (Bankr. S.D. Miss. 2016) (agreed order in first Chapter 7 case made debt

nondischargeable in a second Chapter 7 case, where the order stated specifically that it was made

"pursuant to § 523 and § 727 of the Bankruptcy Code"); *see also In re Paine*, 283 B.R. 33, 37 (B.A.P. 9th Cir. 2002) (debts excepted from discharge under Section 523 are forever nondischargeable unless they fall under one of the eight enumerated categories in Section 523(b)).

Consequently, the Court finds the Agreed Order unambiguous as a Section 1305(b) order, the scope of which was limited to arranging for partial payment of plaintiffs' claim through defendants' plan but without the discharge of the balance that normally would have occurred at the end of the First Case under Section 1328(a). No examination of extrinsic evidence is necessary. In reaching this conclusion, however, the Court is not limiting plaintiffs in any way from litigating nondischargeability now. If plaintiffs want their claim deemed nondischargeable, then they will have to meet the appropriate burden of proof at trial.

## IV.    CONCLUSION

The parties negotiated the Agreed Order in 2015 to give themselves certainty as to how to treat plaintiffs' post-petition damages claim in the First Case. The Agreed Order went no further. Plaintiffs' might yet be able to prove that defendants' debt is nondischargeable under Section 523(a)(6), but specific findings will be necessary.

For all of the above reasons, the Court will deny plaintiffs' motion for summary judgment (Doc. No. 23). The Court will grant defendants' motion for summary judgment (Doc. No. 19) in part to confirm that collateral estoppel does not apply to the Agreed Order. The Court will deny defendants' motion in all other respects. This adversary proceeding will proceed to trial on the nondischargeability of plaintiffs' claim under 11 U.S.C. § 523(a)(6).

A separate order will follow.

# # #

16